BARDE STEEL PRODUCTS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 12262. Promulgated November 14, 1928.

*W. W. Spalding, Esq.*, and *Roscoe C. Nelson, Esq.*, for the petitioner.

*Shelby S. Faulkner, Esq.*, for the respondent.

214

216

SEIFKIN: The sole question herein presented for our consideration is whether the respondent properly excluded the steel in controversy from petitioner's inventory. Apparently respondent seeks to justify the exclusion on the ground that the title to such steel had not passed to petitioner by the close of the year. On the other hand, petitioner asserts it had the beneficial title by the close of the year, which required it to take the goods into inventory and to accrue the correlative liability. It is further contended on behalf of petitioner that, irrespective of the question of title, accurate and consistent accounting principles dictate the accrual of the liability for the steel, and that it was an error to exclude the balancing entries into cost of goods sold and closing inventory.

It will be noted that the contract was for unascertained goods. It is not claimed that title passed when the contract was entered into. Petitioner's contention as to title is that certification of the steel in question was an irrevocable appropriation to the contract, and the contract, as well as the actions of the parties thereunder, show the intent to pass title at the time of such certification.

The proposition that certification constituted an irrevocable appropriation to the contract may well be questioned in view of the contract provision that the seller did not guarantee the accuracy of the certification, and the clear inference from the last paragraph of Article I that excepted steel, though certified, may still be treated as excepted unless it has been resold by the buyer. For purposes

of this opinion we may, however, assume that certification served to identify the goods as specific goods. Such assumption brings us to a consideration of the second proposition of petitioner's contention that the contract and actions of the parties show it was the intent of the parties that title pass upon such certification.

Article II of the contract provides:

(6) All such excess steel * * * shall remain the property of the Seller until delivered to the Buyer as hereinafter mentioned. It is agreed that, for the purpose of this contract, delivery of said steel shall not occur until the same has been certified, checked and actually loaded on the cars.

We thus have the expressed equivalent of the ordinary presumption which arises in the case of f. o. b. contracts, that title does not pass until the seller actually loads the goods on the cars. *Brown Lumber Co.*, 9 B. T. A. 719.

Obviously, there is a marked difference in the weight attaching to an intent thus actually expressed and the weight to be accorded an intent inferentially derived, with the aid of a legal presumption, from the use of the letters f. o. b. Here the parties expressed their intent in unambiguous terms. We find nothing in the definition of the word "property," whether it was used to designate the steel or the rights with respect thereto, indicating that the bare legal title alone was reserved to the seller. We are bound by such expression unless, as petitioner urges, other provisions of the contract, together with the actions of the parties in carrying out the contract, are in conflict with the import of such expression and operate to pass at least actual beneficial ownership to petitioner upon certification.

To establish this change in beneficial ownership petitioner relies upon (1) the provisions and proof showing it to be within the contemplation of the parties that petitioner was to proceed to resell the steel upon certification, and (2) the provisions in Article V that "where the Seller shall fail (except by reason of strikes, fire, riots, acts of God or public enemy) or refuse to begin and continue diligently to comply with said directions for loading within five days from the receipt of said notice by the Seller, the Buyer may, in its discretion, load said steel specified in said directions and deduct the actual cost of loading from the amount due the Seller " if the amount did not exceed a specified amount. This provision, together with the interpretive acts of the parties, it is urged, shows possession of or dominion over the steel, and that beneficial title passed at the time of certification.

Respecting the contemplation of resale upon certification, petitioner contends it cannot sell something which it does not own. That is true. But it is also true that one can *contract* to sell that which one does not own. The latter possibility is equally consistent

with the parties contemplating resale and the provision reserving title to the seller. As between a view bringing two provisions of a contract in conflict and one reconciling such provisions, we must adopt the latter.

Having rejected petitioner's theory as to the effect of the alleged right to resell, there remain the provisions of the contract and the acts of the parties which, it is insisted, gave petitioner possession of, or dominion over, the steel once certification was made. It should be noted at this point that the steel was in storage in various yards in the name of the seller. Possession was in the yard owner at the time of the certification and we see nothing in the mere act of certification to transfer such possession. A brief survey of the other facts of record and of the contract as to their bearing upon possession or dominion is timely.

Upon receipt of the certification notice, petitioner sent a representative to check the goods, care for it, and sell from the yard if he could. We have assumed above that certification ascertained the specific goods. Petitioner checked the goods and found the certification notice correct. But the contract provided for checking by both parties and the seller was granted until five days after the receipt of loading orders to so check. As loading orders were never given with respect to the steel in question, the seller was never called upon to check the goods. Thus the second step preliminary to the passage of title, as expressed in the above quoted subdivision 6 of article II, was never completed.

Petitioner's representative, who was sent to the yard, also, we are informed, cared for the steel and made yard sales whenever possible. We are unadvised as to the nature of the cars or the extent of yard sales, if any. We see nothing in these facts tending to show possession or dominion over the steel in the petitioner. Nor do these facts necessarily conflict with the express reservation of property rights to the seller.

To show the alleged possession or dominion, petitioner dwells upon the contract provision purporting to give petitioner the right to load the steel in case the seller fails or refuses to comply with an order to do so. The petitioner apparently considers the provision either as a grant of power, which, in its ultimate effect, is somewhat similar to that recognized by the courts in granting specific performance of a contract, or as giving them such title as would enable them to replevin the goods. In view of what is said below the alleged right to replevin, which depends upon title, is clearly untenable. By such interpretation petitioner seeks to bolster its claim that beneficial ownership had, contrary to the expressed intent, passed at the time of certification. One pertinent objection to such

interpretation is that the contract is very different in character from those in which specific performance is ordinarily recognized. So far as appears the seller is concerned only in selling the steel at a specified price while the petitioner, as buyer, is interested only in acquiring the profit which might be anticipated from resale. Compensation in the form of damages would be adequate relief to either party in such circumstances. Since this is usually ground for denying relief in the form of specific performance or its equivalent, it seems odd, that, had the parties contemplated anything approaching such extraordinary relief in case of the seller's default, they did not at least attempt by express terms to grant such right to the buyer. This is especially true in view of the detailed terms of agreement in other regards.

More important still, we think there is a plausible explanation for inserting the provision in question, and a purpose to be thereby accomplished which was consistent with the contract as a whole. Petitioner expected to contract for the resale of the excess steel. It was essential that it have some assurance as to when such steel could be delivered upon resale, so that it could contract accordingly. The provision thus served not only as a basis for contracting but as a protection to petitioner in case it was unable to meet its resale contract by reason of the seller's delay or default. Any damage liability which accrued to it because of such delay or default would give a cause of action against the seller to recover such damage liability, if the petitioner was prevented by the seller from exercising its option to load at the seller's expense. Not only is such purpose entirely consistent with the contemplated resale, but it explains the clause limiting default of the seller to delay or default not due to strikes, fire, riots, etc., which limitation would seem to be senseless under the interpretation urged by the petitioner.

The supplemental contract which was drafted by the seller and entered into on July 6, 1920, refers to the original contract "by the terms of which the Seller sold to the *Buyer* certain excess steel * * *." Petitioner contends this evidences the state of mind of the parties to be that the sale was completed by that time. As was pointed out above, the original contract was for unascertained goods and, therefore, could not effect a completed sale. In *Brown Lumber Co., supra*, we stated that little reliance could be placed upon the use of the words "sold" or "to sell" as they are used interchangeably. This is borne out here by the much less definite terminology in a later supplemental contract referring to the original contract as "providing for the sale." In a doubtful case such supplemental expressions might be significant as to the then intent of the parties, but we do not attach much weight to them in the instant case. Petitioner also cites a number of consignment cases in support of its contention. As these

cases turn largely upon the fact of shipment, a fact altogether absent in this case, we do not consider them as pertinent authority.

We consider that there is nothing in the contract, or in its interpretation by the parties, that justifies our setting aside the expressed intent of the parties as to when title passed. We have found the provisions relied upon by the petitioner to be wholly consistent therewith. The parties were free to make such terms as they chose and they are bound thereby. We may also add that, though equitable title has passed in a case in which specific performance may be granted, it does not follow that a liability accrues at that time. See the discussion below in *North Texas Lumber Co.*, 7 B. T. A. 1193.

There remains the question whether, irrespective of title, the alleged liability was a proper accrual as of the close of the year. Petitioner accrued such liability promptly when certification notice was received and insists that, under sound accounting principles, the adoption of such method fairly reflected its financial condition, and that such method should be approved as in accord with section 212 of the Revenue Act of 1918, and article 23 of Regulations 45.

Before discussing the question raised, it is essential to point out a confusion of terms. Section 212 and article 23 provide that approved methods of accounting will ordinarily be regarded as clearly reflecting income. The income-tax law is concerned only with the income and its reflection in the proper accounting period which determines the tax to be levied for such period. On the other hand, petitioner speaks of reflecting its condition as a banker would view it. Obviously, yearly income is very different from financial condition. A banker would be unwise to disregard conditions which bear upon the future prospects of a business. From his point of view business is a continuous endeavor which may not be judged as of a single calendar year. A clear reflection of yearly income and not of financial condition is the subject matter of our inquiry.

The facts and contract provisions pertinent to the question may be briefly stated. On January 9, 1920, petitioner entered into a contract to buy certain steel which might be ascertained by the seller at any time before January 9, 1921. Petitioner had one year from the date of ascertainment within which to sell and take delivery of the goods. Petitioner could not be invoiced prior to delivery (except where the time limit had expired) and delivery could not be tendered by the seller until orders for loading were given and complied with. Payment was due upon the next first and/or fifteenth of the month of invoice. The steel in question was not invoiced in 1920 and could not be invoiced (because loading orders were not given) until one year after its certification, which extended into the petitioner's calendar year 1921. Reduced to its essentials, the question presented

is whether a liability for goods (title to which was retained by the seller throughout the year), contracted for in 1920, for which payment was not due until sometime in 1921, was a proper accrual by the close of the year 1920.

We think the question raised is governed by the rule applied in *Brown Lumber Co.*, *supra*, in which this Board excluded goods from closing inventory because title had not passed. That decision held in effect that no liability accrued where title had not passed. By reason of the nature of the several contentions advanced by the petitioner, the decision in the *North Texas Lumber Co.*, *supra*, is of special interest. In that case we said:

* * * The undisputed evidence is that on December 27, 1916, the parties arrived at an agreement as to the value of the land and the purchaser expressed satisfaction with the title. No contract of sale was made on that date, however, for the purchaser found it necessary to make arrangements for financing the purchase price. A ten-day option was granted the Southern Pine Lumber Co. On December 30, 1916, it gave notice of its intention to exercise such option, thereby creating an enforceable contract between the parties for the sale of the property. It is contended that at that time the sale of the property became executed, that the purchaser acquired title and that the purchase price became due to the petitioner. The deed to the property was delivered and the purchase price paid on January 5, 1917.

In support of its contention, petitioner points out that on December 30, 1916, the purchaser was ready, able, and willing to perform the contract, that it had already passed upon the title of the petitioner as satisfactory, that the petitioner withdrew from the property the workmen who had theretofore been engaged in the construction of a mill, that upon the closing of the title adjustments were made as of January 1, 1917, and that the purchaser paid taxes after January 1, 1917. None of these factors, however, seem sufficient to vest title to the property in the purchaser or to entitle the seller to have maintained an action in 1916 for the purchase price.

We do not question that equitable title passed to the purchaser at the time the option was exercised and a contract to sell came into effect, so that any loss or damage to the property would have been the loss or damage of the purchaser. We do not understand, however, that because equitable title may have vested, the vender then has a legal right to recover the purchase price, which is the principal question here involved the books of the petitioner were kept upon an accrual basis.

Ordinarily one who has entered into a contract for the sale of property, whether real or personal, has no right to recover the purchase price until the delivery of the property sold. In the case of real property a right to recover by way of an action for specific performance may exist when a proper tender has been made. Here there was no delivery of the property to the purchaser either by giving it possession of the property, by delivery of a deed, or otherwise, until January 5, 1917, and no tender of delivery, and it was not until 1917 that any right to demand or receive payment of the purchase price arose.

The decisions cited by petitioner may readily be distinguished from this proceeding. Petitioner relies principally upon the case of *Amalgamated Sugar Co.*, 4 B. T. A. 568. There it was held that title had

222

passed when the liability accrued. However, both the concurring opinion and several statements in the majority opinion indicate that the liability accrued irrespective of the title passing. Such statements were based on a consistent accounting practice established over a long period of dealing, a normal year, and trade customs. No such facts are presented in the instant case. The proof as to alleged consistency in accounting practice of petitioner is limited to the treatment accorded the goods involved in this single contract which was entered into during the year in question. We have no evidence showing this to be a normal year, and as far as the record shows, there were no trade customs interpreting such contracts.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

MILLIKEN and MURDOCK concur in the result.